Paul S. DOPP, Plaintiff,

v.

FRANKLIN NATIONAL BANK et al.,
Defendants.

No. 71 Civ. 4411.

United States District Court,
S. D. New York.

April 5, 1974.

As Amended April 25, 1974.

Dublirer, Haydon & Straci, New York City, for plaintiff; Charles Haydon, New York City, of counsel.

Hofheimer, Gartlir, Gottlieb & Gross, New York City, for defendants Butler, Aviation International, Inc., G. Norman Widmark and Reginald F. Woods; Sylvia D. Garland, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge.

Defendants Butler Aviation International, Inc. ("Butler"), and G. Norman Widmark ("Widmark"), and Reginald F. Woods ("Woods"), officers and directors of Butler, have moved for an order pursuant to Rules 12 and 56, F.R.Civ.P., dismissing the complaint against them on the grounds that it states no claim on which relief can be granted; that plaintiff lacks standing to maintain an action to recover damages against these defendants for alleged violations of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder; and that since there is accordingly neither diversity jurisdiction nor a federal question, the complaint must be dismissed.

Initially, this action was commenced in 1971 in an effort by plaintiff Dopp, a former President and Chairman of Butler, who was engaged in a proxy fight for control of the Company, to block the sale of a number of shares of Butler's common stock which Dopp had pledged to Franklin National Bank ("Franklin") as collateral for a loan on which he had defaulted. At Widmark's suggestion, Franklin gave an option to the brothers John and Michael Galesi to purchase the shares at a private foreclosure sale, as part of an admitted effort by Widmark and the other defendants to reduce plaintiff's voting power and prevent his regaining control in view of Butler's financial misfortunes during his tenure, which they attributed to his mismanagement and possibly even misapplication of funds. Dopp sought, initially, a preliminary injunction prohibiting consummation of the option agreement and, ultimately, rescission of the agreement. The District Court granted the preliminary injunction, 346 F.Supp. 424 (S.D.N.Y. 1971), and defendants appealed. The Court of Appeals for the Second Circuit reversed, 461 F.2d 873 (2d Cir. 1972), finding the following "virtually undisputed" facts:[1]

In July, 1969, while President and Chairman of Butler, Dopp pledged 51,500 shares of Butler common stock to Franklin for a loan of $380,000[2] secured by a demand note. The promissory note, which incorporated the pledge agreement, provided that "whether or not default exists, the [securities] may be registered and held in the name of the Bank or its nominee, without disclosing that the Bank is a pledgee thereof, and the Bank or said nominee may exercise all voting . . . rights as if the absolute owner thereof . . . "; and that upon default the bank could "sell, assign, give option or options to purchase, and deliver any and all securities

pledged as collateral." It was further provided that "no waiver [of the Bank's rights] would be valid unless in writing, signed by the Bank, and then only to the extent therein set forth."

In July, 1970, Dopp still owed $351,000 in unpaid principal, and Franklin was pressing him for repayment. In expectation of an advance from a Swiss company, Dopp assured Franklin he would repay the loan by August 15th. He failed to so do, and on December 16, 1970, Franklin entered a default judgment against him in the amount of $369,447.61.

On January 20, 1971, after negotiation, Dopp and Franklin entered into a new agreement providing that Dopp would have until February 26, 1971 to pay the reduced sum of $325,045.25 plus $7\frac{1}{2}\%$ interest from the date of judgment, failing which the judgment would be enforceable immediately. As additional collateral, Dopp executed second mortgages on two Pepsi Cola bottling plants he owned in Michigan. However, he defaulted again and by May 17, 1971 had paid only $20,000 on the new obligation.

In late May, 1971, Widmark, the new Chairman of Butler, informed Franklin that Dopp's shares were no longer control shares, and Franklin began negotiating through Widmark for the sale of the shares to the Galesis. On June 15, 1971, Franklin gave Dopp formal written notice that it intended to sell the shares at a private sale on or after June 25. On June 28, Dopp again sought time from Franklin to meet his obligation and entered into an oral agreement with the bank that the shares would not be sold if Dopp made a $20,000 payment by July 2, delivered an additional 10,000 shares as collateral, and arranged for the sale of all the pledged shares by July 21.[3] On July 26

---

1. For a fuller recitation of the facts, see both majority and dissenting opinions at 461 F.2d 873 (2d Cir. 1972).

2. The loan had been in excess of $1,000,000 at one time.

3. It is clear that Dopp's performance of a legal obligation by making partial payments on a sum due and owing was not new consideration, and therefore such payments did not constitute reliance to his detriment.

the $20,000 payment was made, although the additional shares were not delivered and no arrangement for the sale of the 51,500 shares was made by Dopp.

Dopp alleges that, in a telephone conversation on August 21, Franklin told him that he would have the right of first refusal either to arrange for a third party of his choosing to purchase the shares, or to redeem the shares himself, without any specified time limitation. On September 21, Franklin and the Galesis entered into an option agreement for the sale of the stock. Franklin informed Dopp of the option one week later, although it did not tell him that the prospective purchasers were the Galesis, having been requested by them not to divulge their identity.

After the Court of Appeals reversed the order of the District Court granting the preliminary injunction, the option agreement was consummated, with the Galesis buying the stock at a price above that at which it was then selling on the American Stock Exchange. Franklin credited Dopp's account with the full amount of the $281,000 purchase price, thus reducing the amount owed on the still unsatisfied default judgment. In October, 1972, after Dopp's petition for reargument and petition for certiorari had been denied, Dopp and Franklin entered into a stipulation of settlement and discontinuance, exchanging mutual general releases, a discharge of the two collateral mortgages and satisfactions of the $369,447 judgment and of an additional judgment for $4,436 in costs. The release given by Dopp specifically reserved any cause of action he had against the other defendants.

The only claim asserted by Dopp against the moving defendants Butler, Widmark and Woods, is that, for the purpose of shifting the balance of voting strength in the proxy fight for control of Butler,[4] defendants conspired with Franklin to breach Franklin's alleged oral agreement giving Dopp the right of first refusal, and to conceal from Dopp the fact that it was the Galesis who had acquired the option to purchase the pledged stock. Dopp seeks only money damages against these defendants for their part in the alleged conspiracy.

## I. STANDING under Section 10(b) and Rule 10b–5

Defendants argue that plaintiff was neither a "buyer" nor "seller" of the securities in question and that he therefore lacks standing to sue under Rule 10b–5.[5] Plaintiff contends that as owner and pledgor of the securities which were sold, he has standing to maintain this action as a "seller". Defendant relies primarily on Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 373 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), and its progeny, see Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963 (2d Cir. 1969), cert. denied· 399 U.S. 909, 90 S. Ct. 2199, 26 L.Ed.2d 561 (1970), which limited standing to sue under Rule 10b–5 to purchasers and sellers of securities who were parties to the transactions at issue. However, in subsequent decisions, the "Birnbaum rule" has been re-

Ryan v. J. Walter Thompson Co., 453 F.2d 444 (2d Cir. 1971) ; 461 F.2d 873, 880 n. 16. Dopp testified at his deposition that he was afraid to give Franklin more shares as collateral.

4. Dopp lost the proxy fight by a substantial number of votes. See 461 F.2d 873, 881 n. 21.

5. In ruling on the preliminary injunction, the Court of Appeals did not reach the issue of standing, 461 F.2d 873, 878 n. 13:
 "We assume for purposes of this appeal, but do not decide, that Dopp has standing to assert a claim under Rule 10b–5 as the beneficial owner of the pledged shares. Whether a debtor who pledges stock to secure a loan retains an interest sufficient to classify him as "seller" even after he has defaulted in repayment of the loan and a court judgment has been obtained against him is a difficult question. Similarly, whether Dopp's allegation that he had been promised a right of first refusal for the stock might give him standing as an "aborted purchaser" has not been considered on this appeal . . ."

laxed by giving the terms "purchaser" and "seller" broadened interpretations, thereby extending the protection of Rule 10b–5 to an increasing variety of interested parties.[6]

There have been several cases in which a pledgor of shares later sold on foreclosure has been ruled a "seller" with standing to sue under the securities acts. In Alloys Unlimited, Inc. v. Gilbert, 319 F.Supp. 617 (S.D.N.Y. 1970), an action was initiated under the 1934 Act, § 16(b), 15 U.S.C. § 78p(b), to entitle the corporation to recover short-swing profits made by a corporate officer who had pledged registered securities as collateral for a loan under a pledge agreement authorizing the bank to sell the collateral "whenever in its discretion [it] considers such sale necessary for its protection." Within six months after the officer had purchased additional, unregistered shares of stock in the corporation, the bank sold some of the pledged shares to reduce the concentration of the officer's stock held as collateral. The Court held that the officer's purchase of the unregistered shares, followed within six months by the bank's sale of the pledged shares, with the proceeds being credited against the officer's indebtedness, was a "sale" by him in violation of § 16b, so that the corporation was entitled to recover the profits realized by him thereon. Thus, for the purposes of § 16b, a sale of pledged stock by the pledgee bank was held to constitute a "sale" by the pledgor, the beneficial owner of the shares.

In Cambridge Capital Corp. v. Northwestern National Bank of Minneapolis, 350 F.Supp. 829 (D.C.Minn.1972), Cambridge Capital Corp. ("Cambridge") sold shares of stock in the Savage State Bank to Charter Management, Inc. ("Charter"). On the same day, Charter obtained a loan from Northwestern National Bank ("Northwestern"), pledging

---

6. Among the classes of plaintiffs which this Court or the Court of Appeals for the Second Circuit have determined to have standing to sue under Rule 10b–5, are:

1. "forced sellers" or "forced purchasers" who were required to sell or buy the stock by
 a. antitrust considerations, Crane v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir. 1969), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970);
 b. the law regulating short-form mergers, Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967);
 c. refusal of a customer who had ordered the stock intending not to accept and pay the broker for it, forcing the broker to sell at a loss, A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967);
2. "aborted sellers" who
 a. had been falsely informed by a fiduciary that it was selling securities for its account, when in reality the fiduciary was selling on its own account, Opper v. Hancock Securities Corp., 250 F.Supp. 668, aff'd, 367 F.2d 157 (2d Cir. 1966); or
 b. had been induced by fraudulent representations to defer sale of securities and who sold later at a loss, Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D.N.Y.1965);
3. "aborted purchasers" who entered into a written agreement to purchase stock which was sold, pursuant to a plan to breach the agreement, to others for a higher price. Commerce Reporting Co. v. Puretec, Inc., 290 F.Supp. 715 (S.D.N.Y.1968).

In the Seventh Circuit, the "Birnbaum rule" has recently been rejected in Eason v. General Motors Acceptance Corp., 7 Cir., 490 F.2d 654 (1973). The Court, quoting the Supreme Court's observations that in construing the 1934 Act "form should be disregarded for substance and the emphasis should be on economic reality," Tcherepnin v. Knight, 389 U.S. 332 at 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), and noting the Supreme Court's construction of Rule 10b–5 in Superintendent of Ins. v. Bankers Life and Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), concluded that the "Court's opinions fairly imply that the rule was intended to protect a broader class of persons." The Seventh Circuit Court found that the "Birnbaum rule" was clearly not, as stated by the Ninth Circuit in Mt. Clemens Industries, Inc. v. Bell, 464 F.2d 339 (9th Cir. 1972), a limitation of constitutional necessity. However, it requested that the Supreme Court resolve the conflict among the Circuits regarding the "purchaser" and "seller" requirement under Rule 10b–5.

the shares as security. In part payment for the shares, Charter gave Cambridge a promissory note, secured by a subordinated security interest in the same shares. Charter defaulted on both loans, and the stock was sold at a foreclosure sale, for a price sufficient to satisfy the indebtedness to Northwestern, but leaving only a small amount to apply against the indebtedness to Cambridge. Cambridge brought an action under Section 10(b) and Rule 10(b)5, charging that significant information had been withheld from the purchasers, thereby reducing the amount realized from the sale of the stock. On a motion to dismiss, the Court concluded that the pledgor Charter and the pledgee Northwestern, as well as Cambridge, which held only a subordinated security interest, were all "sellers".

Herpich v. Wallace, 430 F.2d 792 (5th Cir. 1970), on which defendants rely, is inapposite. *Herpich* involved two separate transactions concerning pledged securities, each resulting in a derivative action on behalf of National American Corporation ("National"). In the first transaction, the Court found that the pledge agreement was pretextural, and was merely a disguised purchase of worthless stock by National, which accordingly had standing to sue under Rule 10b–5. By contrast, in the case at bar, it is not disputed that there was a *bona fide* loan arrangement.

The second pledge transaction involved National's guarantee of a loan secured by pledged stock. Subsequently, National was induced to agree to the substitution of worthless stock for that originally pledged. The Court held that National, as a mere guarantor of a loan which was not in default, would have no interest in the pledged securities unless and until a default occurred, and therefore had no standing as a "purchaser". Here, by contrast, Franklin was the pledgee on a loan which had been defaulted.

■■ In the light of all the relevant precedents, it seems clear that Dopp, who was the beneficial owner of the securities pledged to Franklin, and whose indebtedness was partially discharged by the proceeds of the sale, was a "seller" within the contemplation of Section 10(b) and Rule 10b–5.[7]

## II. FAILURE TO STATE A CLAIM under Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 and Section 17 of the Securities Act of 1933

■■ In considering a motion to dismiss for failure to state a claim on which relief may be granted, all of the material allegations of plaintiff's complaint must be deemed as true. Walker Process Equip. v. Food Mach. & Chem. Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); see Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). The allegations of the complaint against the moving defendants are anything but clear. However, construing them most favorably to the pleader, as directed by Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), and even supplementing them with the assertions made by Dopp in the pretrial order and in his memorandum in opposition to the motion, they consist essentially of the claim that these defendants conspired with Franklin to shift the balance of voting strength in Butler by selling the pledged

---

**7.** Whether the oral promise of the right of first refusal is a legally enforceable oral modification of a written contract under New York State law is an issue that need not be reached. To be actionable under Rule 10b–5, a misstatement or omission need not reach the status of a legally enforceable contract. This issue might be pertinent to the question of whether plaintiff is an "abortive purchaser", but since we find plaintiff has standing as a "seller", this question need not be resolved. Where, as in this case, "serious questions of public law are presented on the pleadings alone, we proceed cautiously, lest we are pulled into academic exercises in a case that may factually never be." Herpich v. Wallace, *supra*, at 802.

shares in violation of Franklin's oral agreement with Dopp, while concealing from Dopp the identity of the prospective purchaser. While these allegations may be sufficient to state a cause of action in tort for interference with business relations under New York State law and in violation of N.Y. Uniform Commercial Code ("U.C.C.") § 9–504 (McKinney 1964), this Court is not persuaded that they constitute a cause of action for fraud under the federal securities laws. Although the antifraud provisions of the federal securities laws provide an extremely broad canopy for the protection of securities traders, the mere fact that securities are involved does not convert a state claim into a basis for federal jurisdiction. Ryan v. J. Walter Thompson Co., 453 F.2d 444 (2d Cir. 1971), cert. denied, 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972). Since the plaintiff and the moving defendants are all residents of New Jersey, there is no diversity of citizenship, and, unless a federal claim is asserted by plaintiff, this Court lacks jurisdiction. Strawbridge v. Curtiss, 7 U.S. 267, 3 Cranch 267, 2 L.Ed. 435 (1806).

■ Dopp alleges that, as a result of defendant's interference with his relations with Franklin, he lost his right to redeem the pledged stock. But, after entry of the default judgment against him, his only interests in the pledged shares were: 1) to receive any excess upon foreclosure sale by Franklin, U.C. C. § 9–504(2); and 2) to redeem the stock *if* he could satisfy his obligation prior to foreclosure. U.C.C. § 9–506. He does not allege that he ever offered to redeem the shares prior to the foreclosure sale, and it seems highly unlikely that he could have arranged to do so. Franklin's only obligation to Dopp therefore was to obtain the best price possible for the collateral at a "commercially reasonable" foreclosure sale [8] and to credit his account with the proceeds. There is no allegation that the price obtained was inadequate.

■ Furthermore, since there is no allegation that the loan was extended to Dopp for the ultimate purpose of converting his pledged securities, Cooper v. North Jersey Trust Co., 226 F.Supp. 972 (S.D.N.Y.1972), Dopp was not "defrauded" merely because Franklin exercised its right of foreclosure at a *private* sale, after giving Dopp written notice of its intention to so do. U.C.C. § 9–504.[9]

■ Moreover, even assuming that Franklin had granted Dopp the right of first refusal, as he alleges, and that this

---

8. U.C.C. § 9–507 provides in pertinent part:
 (2) The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale, or if he has otherwise sold in conformity with reasonable commercial practices . . . he has sold in a commercially reasonable manner. . . .
 The official comment to this section emphasizes the importance of this remedy for failure to comply with the statutory duty as applied prospectively before the unreasonable disposition has been concluded. The Second Circuit, at 461 F.2d 873, 878 n. 13, could not find any evidence to support Dopp's assertion that Franklin had not acted in a commercially reasonable manner.

9. U.C.C. § 9–504 provides, in pertinent part:
 (3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts . . . unless collateral is perishable or threatens to decline speedily in value or is of a type *customarily* sold on a *recognized market, reasonable notification* of the time and place of any public sale or reasonable notification of the time *after which* any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor. . . .
 (4) . . . The purchaser takes free of all . . . rights and interests even though the secured party fails to comply with the requirements of this Part . . . .
 (b) in any other case [private sale] if the purchaser acts in good faith. [Emphasis Added]

right was an enforceable oral modification of a written agreement to the contrary, notwithstanding that U.C.C. § 8–319 and N.Y. General Obligations Law § 15–301 (McKinney 1964) require such agreements to be in writing, there is no allegation that any of the remaining defendants knew of this right. In such situations, there obviously can be no wrong without scienter. Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2d Cir. 1971). We fail to discern how the conduct of these defendants in merely arranging for the purchase of the pledged shares, without knowledge of Dopp's alleged right of first refusal could be conduct actionable under the federal securities laws. Matheson v. White Weld & Co., 53 F.R.D. 450, 452 (S.D.N.Y.1971).

■ In his attempt to make out a case of fraud against the moving defendants, Dopp further alleges that they induced Franklin not to tell him that his shares had been optioned to persons antagonistic to him in the proxy fight. But Dopp does not allege that there was any obligation on the part of Franklin to disclose the identity of the purchasers, and there is no statutory basis for imposing such an obligation on it,[10] nor any precedent for concluding that the information withheld was "material" within the intent of the securities laws. The test of materiality is not whether *this* plaintiff considered the information significant but whether a "reasonable man"—an ordinary investor—would have done so. List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir. 1965), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60, reh. denied, 382 U.S. 933, 86 S.Ct. 305, 15 L.Ed.2d 344 (1965). The identity of the prospective purchasers, which was of interest to Dopp only insofar as it might alter the balance of voting strength, was not a matter about which an ordinary investor would likely

be concerned, because it did not have any foreseeable effect on the value of the shares *as an investment*. See Fershtman v. Schectman, 450 F.2d 1357, 1360 (2d Cir. 1971), cert. denied, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); Dopp v. Franklin, *supra,* 461 F.2d at 878–879, n. 13 and n. 14. Moreover, Dopp has admitted in his deposition that he suspected that it was the moving defendants who were trying to obtain control of the pledged shares; thus his grievance pares down to nothing more than the failure to confirm his suspicion.

Finally, the fact that the accused acts were committed in the context of a proxy fight does not render them any more reprehensible. The acquisition of shares in an attempt to secure corporate control is a common and accepted practice and where it is employed to wrest control from those whose management is believed to be inimical to the interests of the corporation, is even a salubrious one. The Herald Co. v. Seawell, 472 F. 2d 1081, 1092 (10th Cir. 1972); McPhail v. The L. S. Starrett Co., 257 F.2d 388 (1st Cir. 1958). Indeed, at the very time, Dopp and the group he represented were themselves busily engaged in similar activity on their own behalf. See Comm. for New Management of Butler Aviation v. Widmark, 335 F.Supp. 146 (E.D.N.Y.1971).

The allegations against the moving defendants, even if true, do not constitute a "device, scheme, or artifice to defraud" within the contemplation of the federal securities laws. The situation at bar is analogous to that in Shemtob v. Shearson, Hammill & Co., *supra,* in which the Court of Appeals ruled that an alleged breach of a contract by the sale of securities held in a margin account did not give rise to a federal claim. *A fortiori,* an alleged *conspiracy to induce* the breach of a contract by the sale

---

10. U.C.C. § 9–504, *supra,* n. 9, merely requires *reasonable notification of the pending* foreclosure sale by the creditor to the debtor. It imposes no duty to disclose the identity of the purchasers. Therefore, nondisclosure of their identity cannot constitute fraud, although it may give rise to a state claim under this section for lack of good faith.

of securities held by a pledgee, should not do so, particularly under the circumstances of this case.

### III. CONCLUSION

 It therefore appears that, in the absence of either a federal question or diversity, the Court has no subject matter jurisdiction over the cause of action alleged against the moving defendants. There still remains in the action plaintiff's claim against the Galesis for violation of Section 7 of the Securities Exchange Act of 1934, 15 U.S.C. § 78g and Regulation U, 12 C.F.R. § 221, promulgated thereunder, by allegedly borrowing for the purchase of the pledged stock an amount exceeding 35 percent of its current market value. While the Court might have discretion to retain pendent jurisdiction of the state cause of action alleged against the moving defendants, United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Court concludes that it should not do so because there appears to be no overriding public interest involved and because there is no substantial overlapping of the issues and proofs between the State cause and the alleged violation of Regulation U.

The motion to dismiss as to defendants Butler, Widmark and Woods is granted.

So ordered.