**Saul WEITZMAN, Plaintiff,**

v.

**Sidney STEIN, Norman Rubinson and Albert Feiffer, Defendants.**

**No. 70 Civ. 4037 (LFM).**

United States District Court, S. D. New York.

Sept. 6, 1977.

---

Paul S. Flaxman, New York City, by Paul S. Flaxman, Martin Sulkow, New York City, for plaintiff.

Sidney Feldshuh, New York City, by Sidney Feldshuh, Stephan Garber, New York City, for defendant Stein.

Norman Rubinson, pro se.

Feiner, Chernis, Curtis & Goldman, New York City, by Stephen R. Hill, New York City, for defendant Feiffer.

MacMAHON, District Judge.

This is an action for damages for fraud brought under the anti-fraud provisions of the federal securities laws[1] and the common law.

Plaintiff alleges that defendants, Stein, Rubinson and Feiffer ("the Stein group"), while secretly holding an option to buy 50,000 unregistered shares of Radio Hill Mines Co., Ltd. ("Radio Hill"), at $1.50 per share, conspired in a fraudulent scheme to induce plaintiff to purchase through brokers 40,000 shares of Radio Hill as their nominee, at an average price of approximately $3.25 per share. Plaintiff claims that defendants concealed the existence of their option and that they induced him to act as nominee by falsely representing that defendants would own and pay for the stock. Throughout, it is alleged, defendants exploited plaintiff's dependence upon the Stein group for the latter's assistance in financing plaintiff's own failing business, Blank Equipment Leasing Co. ("Blank"). Defendants refused to pay for the Radio Hill stock, and plaintiff was held liable for the purchase price in judgments obtained against him by brokers.

This action, commenced in 1970, was transferred to us on January 19, 1977[2] and tried without a jury from April 25 to April 29, 1977. We render judgment for plaintiff for the reasons below.

## I.

Radio Hill is a Canadian corporation engaged in the exploration and development of mineral resources in Canada and South America. Its shares have never been registered with the Securities and Exchange Commission ("SEC"). In 1969, Michael Gardner was the company's controlling person and chairman of the board, and Leonard Varah was its president.

Varah testified that in March 1969, he was negotiating for the purchase of an onyx mine, when defendant Stein called, claiming to be the finder on the onyx deal and demanding a commission in the form of an option to buy 50,000 shares of Radio Hill, to be issued in defendant Feiffer's name. Varah agreed, and on April 22, 1969, at Stein's request, granted an option in Feiffer's name to buy 50,000 shares of Radio Hill, at $1.50 per share. Certain conditions surrounded the option; Varah would retain possession of the shares underlying the option until buyers were found, and, upon a sale, Varah would retain $1.50 per share and pay the balance to Feiffer.

Although Stein has consistently asserted that the option was solely Feiffer's, we must reject his contention. Varah's testimony establishes that the option was made in Feiffer's name, at Stein's insistence, for services performed by Stein. Furthermore, Feiffer testified that the option was the property of the Stein group. We do not credit Stein's testimony to the contrary, given the evasive and unresponsive nature of his answers, as well as his prior conviction for perjury relating to this very scheme.

Option now in hand, Stein, working closely with his cohorts Rubinson and Feiffer, concocted a scheme to conceal their option on Radio Hill shares, induce third parties to buy Radio Hill stock through brokers, and falsely represent that the third party would only be a nominee for the defendants who would own and pay for the stock when payment became due to the brokers. Varah, drawing on the option stock, would supply the shares to the duped nominees and remit the net proceeds to defendants after deducting the option price of $1.50 per

---

1. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1971), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (1976).

2. The defendants, however, have not been idle over the past seven years. Stein, Rubinson and Feiffer were preliminarily enjoined by then-District Judge Mansfield and later permanently enjoined by Judge Weinfeld from violations of the securities laws arising out of their partici-

pation in the same fraudulent scheme alleged here. *SEC v. Radio Hill Mines Co.*, 1973 Fed. Sec.L.Rep. (CCH) ¶ 93,974 (S.D.N.Y.1973). Stein subsequently pled guilty to charges of perjury based on his testimony at the hearing on the preliminary injunction. *United States v. Stein*, No. 71 Cr. 1049 (S.D.N.Y. Sept. 14, 1971).

share. When the brokers pressed the nominees for payment, defendants would disclaim liability and refuse to pay, leaving the nominees liable for the purchase price.

Their scheme hatched, defendants sought a victim "nominee." Plaintiff proved an easy mark. He was president and sole owner of Blank, an office equipment company which needed financing, and he had begun a business and confidential relationship with the Stein group in July 1968, when Feiffer, whom plaintiff had met socially some months earlier, introduced plaintiff to Stein and Rubinson, who represented that they might be of some help to the company. In October 1968, plaintiff and defendants reached an agreement whereby defendants acquired 50% of Blank in exchange for 25,000 shares of Calculator Computer Leasing Corp.

In early 1969, plaintiff and defendants discussed the possibility of making a public offering of Blank stock. Plaintiff thereafter became dependent upon the Stein group for both interim financing and the effectuation of the plan for a public offering. Feiffer and Rubinson introduced plaintiff to an attorney, whom plaintiff retained to prepare a Regulation A filing and offering circular. Defendants also introduced plaintiff to Gardner and various other underwriters in an attempt to find someone to handle the issue. Gardner's company, Gardner Securities Corp., eventually became the underwriter for Blank's Regulation A offering.

The testimony of Feiffer establishes that he and Stein had a discussion in April 1969 in which Feiffer suggested plaintiff as a possible target for the scheme to exploit the Radio Hill option. Plaintiff seemed an easy mark because he was beholden to the defendants for their efforts expended to save Blank and because plaintiff at this time was still dependent upon the Stein group for continued interim financing and for the promotion of Blank's proposed public offering.

Plaintiff testified that on April 25, 1969, in the midst of the Blank plight, he received a telephone call from Feiffer requesting that he do Stein a favor. Stein then got on the telephone and asked plaintiff to buy 15,000 shares of Radio Hill as his nominee because he did not want to purchase it in his own name. Stein assured plaintiff that he would pay for the stock when payment became due. Stein did not disclose that he and the other defendants had an option on the stock. Although Stein denies participating in this conversation or promising to pay for the stock, Feiffer, in testimony we accept, corroborated plaintiff. The same day (April 25, 1969), pursuant to Stein's instructions, plaintiff placed an order for 10,000 shares of Radio Hill through H. Hentz & Co. ("Hentz"), a Miami brokerage firm. Hentz purchased the shares on the open market, although Varah was probably the ultimate source.

After making the initial purchase, plaintiff called Stein and Feiffer, advising that another 15,000 shares might be available through another brokerage firm. Stein directed plaintiff to purchase the additional shares, and plaintiff did so, placing an order for 15,000 shares of Radio Hill through Dishey, Easton & Co. ("Dishey"), a New York brokerage firm. Dishey's representative informed plaintiff that yet another 15,000 shares were available, advising plaintiff that the shares were coming from a principal of the company.

Plaintiff relayed this last bit of information to Stein, and Stein directed plaintiff to purchase the additional 15,000 shares, stating that he did not care where the stock came from. All told, by the close of trading on April 25, 1969, plaintiff had purchased a total of 40,000 shares on that day. Dishey had purchased the final 30,000 shares through L.J. Forget & Co., a Canadian broker. We accept Varah's testimony that he supplied these shares under the option.

Feiffer also testified that he was present when Stein, in furtherance of the scheme to exploit the option, induced Harry Silbur, a business acquaintance, to order 25,000 shares of Radio Hill as Stein's nominee, on or about April 23, 1969. Varah's testimony establishes that Stein called him from Las Vegas on April 24, 1969, claiming funds due

him under the option agreement. Varah, at Stein's insistence, sent to M & R Investment Co. in Las Vegas $20,000 in Canadian funds on April 24, 1969, and $20,000 in American funds on April 25, 1969. At least a portion of those funds were attributable to Silbur's purchase of Radio Hill stock on April 23, 1969.

Feiffer testified that Stein sent him to Toronto on April 28, 1969 to claim additional monies from Varah under the option agreement. Varah corroborated Feiffer's testimony that he gave Feiffer $30,000 in Canadian funds in cash on April 28. Although Stein denies receiving any of this money, we credit Feiffer's testimony that this sum was later divided equally between Feiffer, Stein and Rubinson.

On or about May 2, 1969, Hentz and Dishey sought payment from plaintiff for the Radio Hill stock, and plaintiff, in turn, called Stein and Feiffer and asked for money. Claiming insufficient funds, Stein told plaintiff he needed more time to raise cash and in order to get time he told plaintiff to instruct the brokerage firms to send the stock to plaintiff's bank against payment. Reluctantly, plaintiff consented, and, upon plaintiff's instructions, the brokerage firms sent the stock to plaintiff's bank.

Payment became due on or about May 20, 1969. That same day, at a meeting in plaintiff's offices, Stein, Rubinson and Feiffer each counseled plaintiff not to pay for the stock.

The knowing participation of Stein, Rubinson and Feiffer in the illegal and manipulative scheme we have described is solidly established by tape recordings of a series of telephone conversations from May 20, 1969 to July 9, 1969.

The tapes reveal that defendants induced plaintiff to adopt various means to avoid paying for the stock. In a May 20, 1969 telephone conversation, Stein instructed plaintiff to attempt to get the Radio Hill stock from the bank without paying for it, to take it to New York, and then to sell it short. In the same conversation, Rubinson told plaintiff to tell the bank that there was an improper delivery of the stock because it

was not in plaintiff's name. He advised plaintiff somewhat circularly that plaintiff would never have to pay for the stock unless it were in plaintiff's name, that it could not be put in plaintiff's name until plaintiff paid for it, and, consequently, that plaintiff would never have to pay for it. When plaintiff informed Stein, in a telephone conversation on May 21, 1969, that Hentz was threatening to sell out the Radio Hill stock, Stein instructed plaintiff to tell the attorney for Hentz (a) that plaintiff had retained a lawyer from a Miami law firm, although this was not true; (b) that he would countersue for selling an unregistered stock; and (c) that, if they did anything to hurt his credit or good name, he would report it to "the authorities."

Hentz subsequently sold out the Radio Hill stock. When plaintiff asked Feiffer, in a telephone conversation on June 4, 1969, if he wanted to take down the information on the sale, he responded that details were unnecessary because plaintiff could "show [them] the slips."

Plaintiff's bank was also pressing him either to accept delivery or to authorize the bank to refuse payment on the remaining stock. Stein, still delaying the day of reckoning, instructed plaintiff, in a telephone conversation on June 4, 1969, to tell the bank (a) that there was some question about the sale of the Radio Hill stock and (b) that his attorney had advised him not to accept the stock. Stein offered to compose a letter to the bank for plaintiff.

After Hentz and Dishey had commenced actions against plaintiff, Stein began to disassociate himself from plaintiff. When plaintiff inquired, in a telephone conversation on June 24, 1969, whether Stein would stand behind him if he lost, Stein responded that he did not want to have any further discussions with plaintiff about Radio Hill and told him to talk to Feiffer or Rubinson. Feiffer thereafter became the major conduit of information between the Stein group and plaintiff. He assisted plaintiff in retaining an attorney to defend the suits by the brokerage firms and handled the other business dealings between the group and plaintiff.

Throughout the course of these events, defendants manipulated and exploited plaintiff by means of his reliance and dependence upon them for interim financing and promotion of the Blank public offering. Feiffer told plaintiff, in a telephone conversation on June 28, 1969, that Stein felt that plaintiff was "bugging him," forgetful of the fact that Stein and Rubinson had gone out of their way to help him. Feiffer also told plaintiff he feared that Stein and Rubinson might "leave you high and dry . . and won't even come out on your issue."

Feiffer, relying in part on Gardner's testimony, attempts to construct a scenario entirely different from that depicted by plaintiff. Gardner testified that plaintiff called him on or about April 25, 1969 inquiring about the short-range prospects of Radio Hill stock and a broker willing to sell the stock. Feiffer claims plaintiff sought this information because he was conspiring with Stein to make a "wash" sale in Canada or a short sale in the United States. He contends that Stein's initial motive was not to defraud plaintiff, but to avoid taxes on the purchase by having plaintiff, who had a tax loss carry-forward, shoulder the tax burden. Feiffer characterizes his own role as a mere pawn and contends that plaintiff was a willing participant in the scheme because he was to receive a commission on the wash or short sale.

Assuming that Gardner's testimony is truthful, we nonetheless find Feiffer's version of the facts incredible. It is belied not only by Varah's testimony to the effect that as early as April 24, 1969 Varah received a call from Stein seeking payment under the option agreement, but also by Feiffer's own testimony that he received an equal share of the $30,000 Varah gave him on April 28, 1969. Furthermore, we accept plaintiff's testimony that he was to receive no commission on a sale of Radio Hill stock. Fi-

nally, Feiffer's theory founders because it fails to explain how plaintiff was to gain possession of the Radio Hill stock in order to sell it.

## II.

### MOTION TO DISMISS

Feiffer, joined by Stein, moves to dismiss the complaint, contending that plaintiff lacks standing under Section 10(b) because he acted merely as the agent for the Stein group and was not a "purchaser" of a security within the meaning of the statute and rule.[3] We disagree.

At the outset, the argument is somewhat inconsistent with the position defendants have taken generally in this action. They now assert that plaintiff purchased Radio Hill shares as their agent, yet they have steadfastly refused to reimburse their "agent" for his purchases, allowing the latter to suffer judgments against him for failure to pay for the shares. In any event, assuming plaintiff's purchases to have been effected as the defendants' agent, the existence of an agency relationship does not preclude plaintiff's standing as a purchaser.

We believe that the decision in *A. T. Brod & Co. v. Perlow*,[4] while not precisely dispositive, provides guidance sufficient to lead us to conclude that plaintiff here is a "purchaser." In *Brod*, a stock broker sued his customers, alleging that the customers had ordered securities through plaintiff with the fraudulent intent of paying for them only if their market value had increased by the date payment became due. The price declined, defendants refused to pay, and plaintiff was forced to sell the securities at a loss. Our Court of Appeals held that the complaint stated a claim for relief under Rule 10b–5 and that plaintiff was clearly a

---

**3.** Defendant refers, of course, to the longstanding "Birnbaum limitation" on Rule 10b–5 actions, see *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 464 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), a limitation recently reaffirmed by the Supreme

Court, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

**4.** 375 F.2d 393 (2d Cir. 1967).

purchaser of securities, despite his purchase as defendants' agent.[5]

*Brod*, fairly read, points toward granting standing to a nominee, who purchases stock from a broker at the request and for the benefit of an undisclosed principal, when ownership is foisted upon the involuntary nominee by the principal's reneging on his promise to pay for the shares.[6] Indeed, such a holding seems particularly appropriate here. It would be anomalous indeed to hold that the existence of an agency precludes standing where, as here, defendants' fraud lies in the very creation of the agency, with its attendant false representations that plaintiff would act merely as nominee and would not have to pay for the purchases. To bar suit by the duped nominee would allow defendants to profit from their own wrong. Additionally, such a rule promotes the policies behind the federal securities laws by discouraging dishonesty in securities transactions and by avoiding an overly technical reading of Section 10(b).[7]

### III.

### CONSPIRACY

■ The evidence conclusively establishes that Stein, Rubinson and Feiffer were knowing members of, and participants in, a conspiracy to violate the securities laws by means of their fraudulent scheme. The three had a business relationship for many years. They all became partners in Blank.

Stein and Feiffer discussed likely victims and engaged plaintiff to purchase the stock. Thereafter, each of the defendants urged plaintiff to adopt dishonest and fraudulent means to avoid payment. They all advised and consulted plaintiff concerning the legal problems resulting from the Radio Hill deal. Most significantly, Stein, Rubinson and Feiffer knowingly shared in the ill-gotten gains of the fraudulent scheme.

### IV.

### RULE 10b–5 CLAIM

■ The essential elements of a Rule 10b-5 claim for relief include: (1) the use of a means or instrumentality of interstate commerce or of the mails in a scheme to defraud; (2) material misrepresentations or omission by the defendants of material facts; (3) an intent to deceive, manipulate or defraud plaintiff (scienter); (4) reliance by plaintiff upon defendants' misrepresentations; and (5) damages suffered by plaintiff as a result of his reliance or due to the fraudulent scheme.[8]

1. *Means or Instrumentalities of Interstate Commerce.*

■ Numerous interstate telephone calls relating to the scheme were placed between plaintiff and each defendant. We find, therefore, that defendants Stein, Rubinson and Feiffer used the means and instrumen-

---

**5.** *Id.* at 397 n. 3.

**6.** Several other decisions, again analogous but not directly in point, suggest that our holding is correct. See *Woolf v. S. D. Cohn & Co.*, 515 F.2d 591 (5th Cir.), *rehearing denied*, 521 F.2d 225 (5th Cir. 1975), *vacated on other grounds*, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976) (plaintiffs purchased for benefit of other individuals; standing not discussed); *Dopp v. Franklin Nat'l Bank*, 374 F.Supp. 904 (S.D.N.Y. 1974) (pledgor of shares held seller on foreclosure sale); *Getter v. R. G. Dickinson & Co.*, 366 F.Supp. 559 (S.D.Iowa 1973) (defendant stock brokers who purchased from issuer and sold to plaintiff permitted to implead issuer); *Jefferies & Co. v. Arkus-Duntov*, 357 F.Supp. 1206 (S.D. N.Y.1973) (broker held a seller in suit against customer); *Cambridge Capital Corp. v. Northwestern Nat'l Bank*, 350 F.Supp. 829 (D.Minn. 1972) (holder of security interest in shares held

a seller on foreclosure sale by another secured party); *American Bank & Trust Co. v. Barad Shaff Securities Co.*, 335 F.Supp. 1276 (S.D.N. Y.1972) (bank held a purchaser when purchasing for customer's account).

**7.** *A. T. Brod & Co. v. Perlow, supra*, 375 F.2d at 396; *Superintendent of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

**8.** See *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 378–81 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 378 F.Supp. 112, 121 (S.D.N.Y.1974), *aff'd in part, rev'd on other grounds in part*, 540 F.2d 27 (2d Cir. 1976).

talities of interstate commerce in further-
ance of the conspiracy and fraudulent
scheme.

### 2. Material Misrepresentations and Omissions.

█ It is unlawful under Rule 10b-5
"to make any untrue statement of a materi-
al fact or to omit to state a material fact
necessary in order to make the statements
made, in the light of the circumstances un-
der which they were made, not misleading.
. . ." A fact is "material" if a reasona-
ble person would attach importance to it in
determining his choice of action in the
transaction in question.[9] We think it clear
that untrue statements were made concern-
ing at least two facts which meet the test
of materiality: (1) that plaintiff was to
purchase as Stein's nominee; and (2) that
Stein would pay for the shares.

It cannot be disputed that a reasonable
person, when asked by a business associate
to purchase stock, would want to know
whether he was purchasing for his own
account or for that of another. When
asked to purchase for another, he would
further want to know who would pay for
the shares. Yet Stein misrepresented both
facts. While representing that plaintiff
would be a nominee, defendants intended to
foist actual ownership upon plaintiff. Like-
wise, Stein never intended to pay for the
stock, and his promise to do so was an
untrue statement of a material fact.

█ We also conclude that defendants
omitted to state material facts. No defend-
ant disclosed the existence of the option to
purchase Radio Hill shares for less than
half the price plaintiff obligated himself to
pay. A reasonable person would attach
controlling significance to the fact that the
person asking him to buy as his nominee
actually holds an option to purchase identi-
cal shares for half the price, which the
nominee obligates himself to pay. Knowl-
edge of the existence of the favorable op-
tion would, to say the least, arouse suspicion
and prompt further investigation of the
transaction. Accordingly, the failure to dis-
close the existence of the option constituted
an omission of a material fact.

### 3. Scienter.

█ Plaintiff must also prove that de-
fendants acted with the requisite scienter,
i.e., with an "intent to deceive, manipulate,
or defraud."[10] There can be no question
that defendants knowingly intended to de-
ceive and defraud plaintiff. Defendants
told plaintiff that he was to purchase mere-
ly as the nominee for Stein, knowing full
well that the Stein group did not intend to
own the shares and never intended to pay
for them. Rather, from the outset, they
intended to "stick" plaintiff with the shares
and the obligation to pay for them, and to
reap the proceeds that would, and did, ac-
crue to them under the option agreement.

The failure to disclose the existence of
the option is itself highly persuasive evi-
dence of the existence of defendants' delib-
erate intent to deceive, mislead and defraud
plaintiff. Had the defendants truly desired
to own Radio Hill shares, they could have
purchased them directly through the option
at $1.50 per share. There was no point
whatsoever in buying in the market
through plaintiff at $3.25 per share, except
to reap a calculated profit for themselves
by secretly selling their option stock to
plaintiff for twice what they would pay for
it. That could only be accomplished by
deliberately misrepresenting that defendant

---

9. *Marx & Co. v. Diners' Club*, 550 F.2d 505, 514
(2d Cir. 1977); *Herzfeld v. Laventhol, Krek-
stein, Horwath & Horwath*, 540 F.2d 27, 35 (2d
Cir. 1976); *List v. Fashion Park, Inc.*, 340 F.2d
457, 462 (2d Cir.), *cert. denied*, 382 U.S. 811, 86
S.Ct. 23, 15 L.Ed.2d 60 (1965); *SEC v. Texas
Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.
1968) (en banc), *cert. denied*, 394 U.S. 976, 89
S.Ct. 1454, 22 L.Ed.2d 756 (1969) and 404 U.S.
1005 (1971); Restatement (Second) of Torts

§ 538(2)(a) (1977); W. Prosser, Law of Torts
719 (1971). Cf. *TSC Industries, Inc. v. North-
way, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126,
2133, 48 L.Ed.2d 759 (1976) (standard of mate-
riality in proxy rule violations; "substantial
likelihood that a reasonable shareholder would
consider it important . . . .").

10. *Ernst & Ernst v. Hochfelder, supra*, 425 U.S.
at 193–94 n.12, 96 S.Ct. at 1381.

Stein would own and pay for the shares and that plaintiff would merely serve as nominee. These facts, corroborated by the taped telephone conversations, are ample evidence of defendants' intent to defraud plaintiff. The devious and circuitous manner in which the scheme was effectuated in itself negates the existence of an innocent state of mind and amply demonstrates defendants' guilty knowledge and intent.

### 4. Reliance.

■ In order to establish reliance sufficient to recover under Rule 10b-5, plaintiff must prove that defendants' misrepresentations were a "substantial factor" in determining the course of conduct which resulted in his loss.[11] Plaintiff has met this burden. Plaintiff testified that he would not have placed orders for the stock but for Stein's promise to pay for the stock and his assurances that plaintiff would only be a nominee. We accept this testimony because there is no credible evidence that plaintiff either intended to purchase the stock for himself or had sufficient funds to do so.

Defendants point to plaintiff's apparent willingness to act as Stein's nominee and suggest that plaintiff purchased the stock not in reliance upon Stein's representations but merely out of a desire to please the Stein group, his financial benefactors in Blank. As we have already concluded, however, we credit plaintiff's testimony that he would not have purchased at all had Stein not promised to own and pay for the stock. There is no evidence to the contrary, and plaintiff's desire to curry favor with the Stein group does not negative his reliance upon the latter's misrepresentations concerning ownership and payment. We therefore conclude that the false representations were a substantial factor in inducing plaintiff to purchase the stock in his name.

Defendant Feiffer contends, nonetheless, that plaintiff did not rely on any of his statements, even if plaintiff did rely on the misrepresentations and omissions of the other defendants. We have previously determined that defendants conspired to defraud plaintiff and that each of the defendants was a knowing member of, and participant in, the conspiracy and scheme. Feiffer is as culpable as Stein and Rubinson. Moreover, neither Feiffer nor any other defendant disclosed to plaintiff the existence of the option. Treating this case as one in which the defendants omitted to state a material fact, an absence of reliance by plaintiff is not fatal. It is well settled that proof of reliance is not required in cases of omission.[12]

### 5. Damages.

■ Hentz and Dishey obtained judgments against plaintiff. Those damages would not have been incurred but for defendants' acts in inducing plaintiff to purchase the stock, and then in failing to pay for the stock as promised. The damages were therefore caused by defendants' fraudulent acts.

### V.

### IN PARI DELICTO DEFENSE

As an affirmative defense, Stein contends that even if a fraudulent scheme existed, plaintiff cannot recover because he was in pari delicto with defendants. Characterizing the scheme as one to defraud the brokers, who faced the ultimate loss, Stein claims that plaintiff was a willing participant in this scheme and points to the July 9, 1969 taped telephone conversation between plaintiff and Stein to substantiate this contention.

Literally, the term "in pari delicto" means "of equal fault."[13] The doctrine is usually applied to bar recovery by the plain-

11. *List v. Fashion Park, Inc., supra*, 340 F.2d at 462; *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, supra*, 540 F.2d at 33.

12. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

13. *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 135, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

tiff where the latter has "knowingly participated as an equal in the illegal act which caused the loss."[14] Over the years, this notion has proved simple enough in application in purely private disputes between private parties.[15] However, the legislative adoption of comprehensive regulatory schemes, such as the federal securities laws, designed at least in part for the very purpose of aiding and protecting injured plaintiffs, has complicated matters.

■ Since these legislative enactments, the defense of in pari delicto can no longer be considered solely within the framework of traditional equity concepts.[16] In addition to examining the relative culpability of the plaintiff, the courts must also ask whether the application of the doctrine would further the policies behind the federal securities laws, given the particular facts of the case.[17] This additional inquiry has given pause, and the courts have allowed the de-

fense only with caution. Thus, despite the burgeoning development of the law surrounding Rule 10b-5, the extent to which the defense is available in an action under the rule remains unsettled. While the defense has been allowed by some courts,[18] neither the Supreme Court nor the Second Circuit has addressed the issue.[19] The district courts within this circuit are divided.[20] We need not, however, cast our lot with either of these opposing camps. Assuming that the defense is available against both the common law and the Rule 10b-5 claims, we conclude that the elements of the defense have not been sufficiently established.

■ The defense of in pari delicto will be allowed only in the sound discretion of the trial court,[21] and only where (1) the plaintiff's acts were at least as serious as those of the defendant;[22] (2) the plaintiff acted knowingly;[23] and (3) the application of the doctrine would not frustrate the re-

**14.** *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, supra*, 378 F.Supp. at 137, quoting Comment, 54 Minn.L.Rev. 878, 879 (1970).

**15.** See *Woolf v. S. D. Cohn & Co., supra*, 521 F.2d at 226.

**16.** *Nathanson v. Weis, Voisin, Cannon, Inc.*, 325 F.Supp. 50, 53 n.10 (S.D.N.Y.1971); *Trebuhs Realty Co. v. News Syndicate Co.*, 107 F.Supp. 595, 598 (S.D.N.Y.1952) (antitrust laws).

**17.** *Woolf v. S. D. Cohn & Co., supra*, 521 F.2d at 226–27; *Nathanson v. Weis, Voisin, Cannon, Inc., supra*, 325 F.Supp. at 52–54. See also *Kuehnert v. Texstar Corp.*, 412 F.2d 700, 704 (5th Cir. 1969): "The question must be one of policy: which decision will have the better consequences in promoting the objective of the securities laws by increasing the protection to be afforded the investing public."

**18.** The movement permitting the defense has been most noticeable in the Fifth Circuit, *James v. DuBreuil*, 500 F.2d 155, 158 (5th Cir. 1974); *Clement A. Evans & Co. v. McAlpine*, 434 F.2d 100, 104 (5th Cir. 1970), *cert. denied sub nom. Clement A. Evans & Co. v. A. M. Kidder & Co.*, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971); *Kuehnert v. Texstar Corp., supra*, 412 F.2d 700. See also *Hogan v. Teledyne, Inc.*, 328 F.Supp. 1043, 1047 (N.D.Ill. 1971) and cases cited in note 20 infra.

**19.** In *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, supra*, 540 F.2d 27, the Second Circuit did not avail itself of an oppor-

tunity to pass on the availability of the in pari delicto defense. After trial of that matter, we dismissed the counterclaim of the third-party defendant on the ground that he and the defendant were in pari delicto. 378 F.Supp. 125, 137. On appeal, this portion of our judgment was affirmed on other grounds.

**20.** Compare *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, supra*, 378 F.Supp. 125 (available) and *Wohl v. Blair & Co.*, 50 F.R.D. 89 (S.D.N.Y.1970) (available) with *Nathanson v. Weis, Voisin, Cannon, Inc. supra*, 325 F.Supp. 50 (unavailable).

**21.** See cases cited in notes 18 and 20, *supra*.

**22.** *Woolf v. S. D. Cohn & Co., supra*, 515 F.2d at 604; *James v. DuBreuil, supra*, 500 F.2d at 160; *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, supra*, 378 F.Supp. 112, 137; *Nathanson v. Weis, Voisin, Cannon, Inc., supra*, 325 F.Supp. 50, 53 n.11, 55 n.27, 57; *Carpenter v. Hall*, 311 F.Supp. 1099, 1106 (S.D.Tex.1970).

**23.** *Woolf v. S. D. Cohn & Co., supra*, 515 F.2d at 604; *Hooper v. Mountain States Securities Corp.*, 282 F.2d 195, 208 (5th Cir.), *cert. denied*, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1960); *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, supra*, 378 F.Supp. 112, 137; *Hogan v. Teledyne, Inc., supra*, 328 F.Supp. 1043, 1047.

medial purpose of the Securities Exchange Act of 1934.[24] In the instant case, the fault of the parties was clearly not equal. Defendants' characterization of the scheme as one to defraud the brokers is disingenuous. Plaintiff was the principal object of the scheme, for in order for defendants to profit, they had to induce plaintiff to purchase the stock covered by the option. Indeed, had plaintiff sufficient funds to pay for the stock, he would have been the only victim.

Moreover, even if the conspiracy could be conceptually bifurcated into a conspiracy to defraud plaintiff and a conspiracy to defraud the brokers, plaintiff was far from an equal or willing participant in the latter. When plaintiff ordered the stock, he believed Stein would pay for it. He was unaware of the option agreement and received no compensation for acting as a nominee. He derived no benefit whatever from the purchase of the stock. On the contrary, he was subjected to two suits by brokerage firms who obtained judgments against him for over $100,000.

Furthermore, plaintiff was not a knowing wrongdoer. He had no idea that Stein did not intend to own and pay for the stock. He knew nothing of the secret option. Having insufficient funds to pay for the stock, he attempted on several occasions to secure payment from defendants. Nonetheless, as the tapes clearly show, defendants exploited plaintiff's reliance and dependence upon them, securing plaintiff's cooperation in delaying the time for payment by having the stock delivered to plaintiff's bank and by failing to disclose plaintiff's nominee status even after plaintiff was sued by brokers.

We see nothing incriminating in the July 9 conversation between plaintiff and Stein. Even if plaintiff's statements could be tortured to yield some conspiratorial innuen-

does, plaintiff engaged in those conversations for the purpose of taping them and turning them over to the SEC to provide evidence of defendants' fraudulent activities. Plaintiff's comments must therefore be viewed from the perspective of his undercover efforts to induce defendants to implicate themselves. The worst that can be said of plaintiff is that he unwittingly assisted defendants in their scheme. Without knowledge of the existence of the conspiracy and scheme to defraud, plaintiff cannot be found in pari delicto.[25]

Finally, we note that our refusal to accept the in pari delicto defense on these facts fully accords with the policies of the Securities Exchange Act of 1934. Defendants' scheme was pernicious and knowingly fraudulent and is rooted well within the core of evil that Congress sought to regulate and punish. Our decision properly refuses to come to the aid of fraud and accords the intended protection and redress to an injured plaintiff.

Accordingly, we find that plaintiff is not barred from recovery under either Rule 10b-5 or the common law by the doctrine of in pari delicto.

## VI.

## COMMON LAW FRAUD

█ Recovery for common law fraud under New York law requires plaintiff to prove that (1) defendants made a false representation of a material fact, (2) defendants knew it was false when made, (3) defendants made the representation with intent to deceive plaintiff and to induce him to rely upon it, (4) plaintiff did rely upon it, and (5) plaintiff suffered damages as a result.[26]

**24.** II A. Jacobs, The Impact of Rule 10b-5 § 238.02 at 10–60 & n.17 (1977) and authorities cited therein, and note 17 *supra* and authorities cited therein.

**25.** See *Perma Life Mufflers, Inc. v. International Parts Corp., supra*, 392 U.S. at 141, 88 S.Ct. 1981.

**26.** *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, supra*, 378 F.Supp. at 131 and cases cited therein; *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119, 302 N.Y. S.2d 799, 250 N.E.2d 214 (1969); 24 N.Y.Jur. *Fraud & Deceit* § 14 at 47–48 (1962).

We have already determined that defendants were knowing participants in a conspiracy and scheme to defraud plaintiff by knowingly making the false representations of material facts discussed above, and by knowingly omitting to state the material facts discussed above. There is no need to repeat our findings. Suffice it to say that plaintiff has clearly established all the elements of common law fraud against each defendant.

## VII.

We find and conclude that plaintiff has satisfied his burden of proof and that defendants are liable to plaintiff for violations of the securities laws, Section 10(b) and Rule 10b-5, and the common law in an amount equal to the judgments obtained against plaintiff by Hentz and Dishey, plus interest at the legal rate from the date those judgments were entered.

Since we have determined that defendants violated Rule 10b-5, plaintiff's motion for summary judgment by collateral estoppel, based upon *SEC v. Radio Hill Mines Co.*,[27] is denied as moot.

The foregoing opinion constitutes this court's findings of fact and conclusions of law, in accordance with Rule 52(a), Fed.R. Civ.P.

Settlement judgment not inconsistent with the foregoing opinion within ten (10) days.

---

27.  1973 Fed.Sec.L.Rep. (CCH) ¶ 93,974 (S.D.N.Y.1973) (permanently enjoining these defendants on the basis of the scheme now before us).