843 F.2d 618
 Fed. Sec. L. Rep. P 93,705, 25 Fed. R. Evid. Serv. 658
WILLCO KUWAIT (TRADING) S.A.K., Plaintiff, Appellant,
v.
Peter J. deSAVARY, Defendant, Appellee.
WILLCO KUWAIT (TRADING) S.A.K., Plaintiff, Appellee,
v.
Peter J. deSAVARY, Defendant, Appellant.
 Nos. 86-1737, 86-1738 and 86-1743.
 United States Court of Appeals,
First Circuit.
 Argued Sept. 10, 1987.
Decided April 7, 1988.
 
 Michael S. Press with whom Paul M. Brown, Gary P. Rosenthal and Whitman & Ransom, New York City, were on brief, for Willco Kuwait (Trading) S.A.K.
 Richard M. Sharfman with whom James A. Shanman, Mark R. Kook, Sharfman, Shanman, Poret & Siviglia, P.C., New York City, and Mandell, Goodman, Famiglietti & Schwartz Ltd., Providence, R.I., were on brief, for Peter J. deSavary.
 Before CAMPBELL, Chief Judge, GARTH,* Senior Circuit Judge, and BREYER, Circuit Judge.
 LEVIN H. CAMPBELL, Chief Judge.
 
 
 1
 Plaintiff Willco Kuwait (Trading) S.A.K. ("Willco"), a Kuwaiti corporation engaged in the business of trading petroleum throughout the world, brought this action in district court against defendant Peter deSavary, an international financier and entrepreneur, based primarily upon the anti-fraud provisions of the federal securities laws and principles of common law fraud. Willco contends that deSavary fraudulently induced it to pay $10 million toward an agreed upon $25 million purchase price for a 50 percent interest in Independent Refining Corporation ("IRC"), an independent oil refining company based in Houston, Texas, which, according to Willco, was worthless at the time of the transaction. DeSavary, claiming to be the owner of IRC, is alleged to have misrepresented the company's financial condition. DeSavary filed separate counterclaims charging Willco with fraud and breach of contract.
 
 
 2
 After a 12-day jury trial, the district court directed a verdict for Willco on deSavary's fraud counterclaim. 638 F.Supp. 846. The jury found for deSavary on his other counterclaim, awarding deSavary $20 million in damages against Willco for breach of contract and $5.3 million for consequential damages. Willco did not prevail in its action, the jury finding for defendant deSavary.
 
 
 3
 Willco moved for a new trial in its action, alleging that the verdict for defendant deSavary was against the weight of the evidence, and that errors committed by the district court had fatally infected the trial. Willco also moved for judgment notwithstanding the verdict or, alternatively, for a new trial, on deSavary's counterclaim. It alleged that the verdict for deSavary was against the great weight of the evidence and that the damages were excessive. DeSavary moved for an award of attorneys' fees under section 11(e) of the Securities Act of 1933, 15 U.S.C. Sec. 77k(e) (1982).
 
 
 4
 The district court denied Willco's post-trial motions, except it reduced deSavary's damages from $25.3 million to $20.3 million. The court denied deSavary's motion for attorneys' fees. DeSavary filed a remittitur, and the district court entered an amended judgment for deSavary in the amount of $20.3 million.
 
 
 5
 Willco appeals from the judgments both on its main claim and on deSavary's counterclaim. DeSavary appeals from the directed verdict on his fraud counterclaim and from the denial of his motion for attorneys' fees. After consideration, we remand for a reduction in damages and affirm in all other respects.
 
 I.
 
 6
 Willco and deSavary had engaged in business dealings for many years prior to the ill-starred transaction in dispute. In early June 1981, deSavary called Peter Bertelsen and Hussein Elbaz, Willco's managing directors, and offered Willco participation in IRC. At that time deSavary was negotiating for the purchase of IRC. Late in June 1981 Bertelsen and Elbaz spent four days looking at IRC's facilities in Houston, Texas. During their visit deSavary furnished Elbaz a report on IRC, prepared by the firm of Purvin & Gertz, and IRC's unaudited financial statements for the fiscal year that ended September 30, 1980. The two Willco representatives were accompanied by Dr. Samir Seraphim, an employee of Artoc Investment Management Company, from New York. Willco had engaged Dr. Seraphim to conduct an investigation of IRC's financial condition.[1] At their meeting in Houston, deSavary and the Willco people entered into a "handshake" agreement for the sale by deSavary to Willco of a 50 percent interest in IRC. Before leaving Houston, Elbaz informed deSavary that Dr. Seraphim would be returning to Houston to make an examination of IRC's books and financial records. Seraphim prepared a written report that was discussed by Willco's board of directors before the contract was executed.
 
 
 7
 On July 19, 1981, deSavary made a presentation to Willco's board of directors in Kuwait. That same day they entered into a written contract. Willco agreed to purchase a 50 percent investment interest in IRC for $25 million plus $5 million in Willco stocks. An initial payment of $10 million was due on July 31, 1981, and was paid by Willco. The balance of the purchase price was to be paid on October 31, 1981. The agreement also provided that Willco would secure a $50 million letter of credit for IRC. After months of negotiations between the parties, in May 1982 Willco decided not to make any additional payments and instead commenced this action, requesting inter alia restitution of the $10 million originally paid to deSavary.
 
 
 8
 Not surprisingly, the parties presented at trial very different pictures of what happened between them, and why the enterprise failed. Willco contends that in 1981 it was defrauded by deSavary. The gist of its story was as follows: Willco said its guard was down in dealing with deSavary because of their previous, mutually successful business dealings. Their course of dealing was usually the same. DeSavary would present a business proposal to Willco and the latter would participate in the deal, relying upon deSavary's recommendation, with little or no independent investigation of its own. Willco says that when its representatives, Elbaz and Bertelsen, were in Houston in 1981 negotiating the purchase of IRC, they were subjected to a series of material misrepresentations and omissions concerning IRC. Specifically, Willco says that deSavary did not inform its representatives of the critical financial situation of IRC and of the existence of a $40 million demand loan. With regard to Dr. Seraphim's investigation, Willco argues that it was a limited one and that he did not have access to some pertinent financial information of IRC. Willco also claims that in late September 1981, during a meeting in Houston, Willco's representatives first learned of IRC's poor financial condition. It was this information which led them to suspect that IRC was not so favorable an opportunity as deSavary had lead Willco to believe. Willco presented its case to the jury primarily through the testimony of its own personnel and several IRC officials.
 
 
 9
 DeSavary's tale was much different: he presented evidence suggesting that Willco had conducted an independent investigation of IRC and that Willco was fully informed of all material facts when it entered into the contract. It went forward notwithstanding IRC's financial plight, because it wanted IRC's refinery facilities and there were favorable financial possibilities. DeSavary testified that he had insisted that Willco should conduct its own investigation and examination of IRC's books and records. He also testified that he fully advised Willco's representatives concerning IRC's financial condition and recommended that they contact IRC's bank, which was also Willco's bank. He said, in particular, that he had disclosed to them that IRC's principal debt was a $46 million demand loan that was in default, that the bank had a lien on all of IRC's assets, and that the company had lost tens of millions of dollars in recent months.
 
 
 10
 On cross-examination some of Willco's witnesses partially supported deSavary's position. There was also evidence contradicting Willco's assertion that it had always trusted deSavary. For example, one of Willco's managing directors, Elbaz, deposed that he felt deSavary had lied to Willco with respect to other transactions. Omar Alyagout, the current chairman of Willco, testified that Willco was losing money with deSavary in other projects and that he did not believe in any project, including this one, offered by deSavary. Alyagout testified that at the very beginning he was against the IRC proposal. There was also some evidence undercutting Willco's insistence that Seraphim's investigation was a limited one. Willco's witnesses testified that Seraphim was Willco's "eyes and ears" for investments in the United States. According to these witnesses the purpose of Seraphim's investigation was to determine whether there were any material changes in IRC which were not reflected in IRC's 1980 unaudited financial statements or in the 1981 Purvin & Gertz valuation study of IRC.
 
 
 11
 DeSavary argues that when Willco entered into the agreement, it was fully aware of the type of risk it was taking. Willco invested under those conditions precisely because that was the only way it had to get a refinery at a reasonable price. Willco's witnesses admitted that IRC's refinery assets were valued between $100 million and $115 million.
 
 
 12
 The July 19, 1981, contract provides that Willco will obtain letters of credit for IRC for not less than $50 million. In September 1981 Willco was requested to provide the $50 million letter of credit. On October 25, 1981, Willco wrote deSavary a letter stating that information provided by him "may have been" misleading and therefore they would not pay the remaining $15 million. However, in November 1981 Willco promised deSavary that it would provide additional equity financing for IRC. During that month also, Willco sought to attract others to invest in the IRC project.
 
 
 13
 In February 1982 Fahmy Meguid, Willco's deputy general manager, travelled to IRC with Willco's New York attorneys and conducted another investigation of IRC's financial books. At its March 1982 board meeting, Willco had determined to proceed with the IRC transaction, subject to obtaining approval from the Kuwaiti Finance Ministry for an increase in capital. The minutes of that meeting disclose that Willco's principals were in agreement that the IRC transaction was "a good deal." The next day, March 26, 1982, Willco sent a telex to deSavary stating that Willco had determined to proceed, subject to six conditions and requirements.
 
 
 14
 In Willco's May 9, 1982, board minutes, it is set forth that Willco backed out of the transaction because it could not obtain the approval from the Kuwaiti government necessary to increase its capital. The primary concern at that moment was that deSavary could sue Willco for its breach of contract.
 
 
 15
 Apparently the jury determined that Willco abandoned the arrangement not because it discovered fraud by deSavary but because market and other conditions no longer made the venture attractive and feasible.
 
 II.
 
 16
 We turn first to Willco's appeal from the judgment against it in Willco's claim against deSavary.
 
 
 17
 Willco sued deSavary for damages under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) (1982), and Rule 10b-5 promulgated thereunder, 17 C.F.R. Sec. 240.10b-5 (1987). To prevail under Rule 10b-5 "a plaintiff must prove, in connection with the purchase of a security, that the defendant, with scienter, falsely represented or omitted to disclose a material fact upon which the plaintiff justifiably relied." Kennedy v. Josephthal & Co., 814 F.2d 798, 804 (1st Cir.1987). In Kennedy, we pointed out that in determining whether reliance upon a purported misrepresentation was justifiable, courts have paid attention to such factors as,
 
 
 18
 (1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.
 
 
 19
 Id. (quoting Zobrist v. Coal-X, Inc., 708 F.2d 1511, 1516 (10th Cir.1983)).
 
 
 20
 In Willco's case against deSavary, the critical points were whether deSavary had falsely misrepresented or withheld from Willco significant information as to IRC's poor financial condition, and, if so, whether Willco had justifiably relied on these misrepresentations or omissions in entering into the contract.
 
 
 21
 Willco contends that the jury's verdict for deSavary was so contrary to the weight of the evidence as to warrant a new trial. In addition, Willco contends that the evidence reaching the jury was distorted by the district court's erroneous evidentiary rulings. We disagree. We think the lower court properly refused to order a new trial, and that its evidentiary rulings did not constitute reversible error.
 
 
 22
 A new trial should be granted "only where the court is convinced that the jury verdict was a 'seriously erroneous result' and where a denial of the motion will result in a 'clear miscarriage of justice.' " Chedd-Angier Production Co. v. Omni Publications International, Ltd., 756 F.2d 930, 934 (1st Cir.1985) (quoting Coffran v. Hitchcock Clinic, Inc., 683 F.2d 5, 6 (1st Cir.), cert. denied, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982)). Here there was ample evidence to support the jury's verdict for defendant deSavary on Willco's fraud claim. The testimony of deSavary, together with Willco's witnesses' testimony on cross-examination and with Willco's board of director's minutes, amply justified the jury's conclusion that the collapse of the venture was a consequence, not of dishonest dealings by deSavary, but of later circumstances that induced Willco to reassess the deal. That the jury was not impressed with Willco's witnesses and theories of recovery is no reason for a new trial. The district court accordingly did not err in denying Willco's motion for a new trial on its fraud claim.
 
 
 23
 Willco also contends the outcome was prejudiced by the court's admission of inadmissible evidence, and its erroneous rejection of admissible and pertinent evidence favorable to Willco. We turn next to these evidentiary assertions.
 
 A. DeSavary's Testimony of Ownership
 
 24
 Willco contends that the district court erred when it admitted deSavary's conclusory testimony that he was the owner of IRC.
 
 
 25
 There was no dispute that the registered owner of IRC's stock was a Delaware corporation named Peninsular Petroleum Corp. It was also undisputed that the stock of Peninsular Petroleum was owned by a Dutch corporation named Peninsular Petroleum B.V. The stock register of Peninsular Petroleum B.V. was received in evidence; it listed persons other than deSavary as the owners of the stock of that corporation. However, on re-direct examination deSavary was allowed to testify that the listed registered stockholders of Peninsular Petroleum B.V. were his nominees and that he was the beneficial owner of that company.
 
 
 26
 Willco contends that deSavary's testimony that he was the beneficial owner of IRC should have been excluded because it was a legal conclusion with regard to a fundamental issue in the case. The cases Willco cites in support of its theory, among others, Metropolitan Auto Sales Corp. v. Koneski, 252 Md. 145, 249 A.2d 141, 146 (1969); Downs v. Brandon, 49 Ga.App. 198, 174 S.E. 647 (1934); Servel v. Corbett, 49 Idaho 536, 290 P. 200, 202 (1930); Thompson v. Portland Hotel Co., 209 Mo.App. 476, 239 S.W. 1090, 1093 (1922); Clark & Barker v. Eufaula Brick Works, 205 Ala. 545, 88 So. 669 (1921), hold that conclusions by a witness with regard to ownership or agency, when those are fundamental issues in a case, are not admissible. This is an application of the now largely discredited "ultimate facts rule." See 7 J. Wigmore, Evidence Sec. 1960 (Chadbourn rev. 1978). The doctrine, in "its most extreme form ... held that no expert--whether lay or skilled--could express 'any opinion which would even tend to be decisive on an issue.' " J. Weinstein & M. Berger, Weinstein's Evidence p 704, at 704-6 (1987). The "ultimate facts rule" was abolished by Fed.R.Evid. 704, which in part states,
 
 
 27
 testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of facts.
 
 
 28
 This is not to say that there are no limits on the introduction of opinions. Rules 701 and 702, for example, require that the opinion of a witness assist the trier of fact. An opinion that "will do little more than tell the jury what result to reach ... will be inadmissible." 11 J. Moore & H. Bendix, Moore's Federal Practice Sec. 704.02 (1985).
 
 
 29
 We need not decide here whether the present testimony was admissible under the current rules.[2] The record shows that Willco had in any event waived its objection to the admission of deSavary's ownership testimony. Similar testimony had been earlier elicited, without objection, by Willco's own counsel when cross-examining deSavary. Reading from a prior deposition of deSavary, Willco's counsel inquired of him as follows:
 
 
 30
 Q. Do you recall, sir, being asked this question and giving this answer or these answers ... in your deposition in London in the summer of 1985.... "Question" "May I take it from your prior responses there was one stockholder which held all the outstanding shares in Penninsula [sic] Petroleum Corporation, a Delaware Company? Answer: Yes. And that stockholder was the Dutch Penninsula [sic] Petroleum Company? Answer: Yes. Of which you owned 100 percent beneficially? Answer: I am not sure from memory whether I owned the stock of the Dutch company or indeed if it in turn had its stock held by another company in the corporate structure. The end result was that whatever other companies may or may not have been in the structure through that structure I directly controlled 100 percent of the stock of the end holding company which controlled all the subsidiaries throughout the corporate chain" Do you remember giving that answer?
 
 
 31
 A. Yes, absolutely.
 
 
 32
 (Emphasis added.)[3]
 
 
 33
 An objection to the admission of evidence has to be "timely" made by the party opposing admission. Fed.R.Evid. 103(a)(1);[4] Shepp v. Uehlinger, 775 F.2d 452, 454 (1st Cir.1985); Reagan v. Brock, 628 F.2d 721, 723 (1st Cir.1980). For an objection to be timely it has to be made " 'at the earliest possible opportunity when, by so doing [it] can enable the trial judge to take the most efficacious action,' " Saville v. United States, 400 F.2d 397, 400 (1st Cir.1968), cert. denied, 395 U.S. 980, 89 S.Ct. 2137, 23 L.Ed.2d 738 (1969) (quoting Holden v. United States, 388 F.2d 240, 242-43 (1st Cir.), cert. denied, 393 U.S. 864, 89 S.Ct. 146, 21 L.Ed.2d 132 (1968)). See 1 J. Wigmore, Evidence Sec. 18, at 796 (Tillers rev. 1983) (an objection "must be made as soon as the applicability of it is known (or could reasonably have been known) to the opponent, unless some special reason makes a postponement desirable for him and not unfair to the proponent of the evidence."). An objection to the admission of evidence is also waived if the evidence was first elicited by the party now objecting. Burgess v. Premier Corp., 727 F.2d 826, 834 (9th Cir.1984); J. Weinstein & M. Berger, Weinstein's Evidence p 103, at 103-15 (1986). "[T]he opponent whose questions calls in advance for obviously inadmissible evidence has thereby waived objection to the answer, and he cannot object if the other party subsequently makes use of the very evidence that he has elicited." 1 J. Wigmore, Evidence Sec. 18, at 836.
 
 
 34
 In the instant case, not only was there no timely objection to the admission of deSavary's testimony when he first testified about his ownership of IRC, but it was Willco who first elicited the evidence. It was only after deSavary had testified in detail concerning his ownership of Peninsular and IRC on Willco's cross-examination, that Willco for the first time, during re-direct, objected to a question concerning deSavary's ownership of Peninsular. Since Willco had elicited the testimony on cross-examination and had not then objected or moved to strike, it waived any objection to the admittance of deSavary's testimony over the same issue during re-direct.
 
 
 35
 Even if properly admitted, Willco suggests that deSavary's ownership testimony was insufficient as a matter of law to rebut the "presumption" created by Peninsular's stock register that he did not own IRC's stock. Willco builds its argument upon the hornbook rule that "where a person's name appears upon the stock book or stock ledger of a corporation, even though not signed by him, the book is competent evidence to show that he is a subscriber or stockholder, and is prima facie proof and raises a prima facie presumption of that fact," and that, in an action against the named stockholder, he has the burden of showing that he is not the stockholder. W. Fletcher, 4 Fletcher Cyclopedia Corporations Sec. 1976, at 777 (1985). Willco wishes to go a step further and infer a counter-presumption that if the name of a person does not appear in the stock book, there is a presumption that he is not an owner. No specific authority is cited for such a reverse presumption.
 
 
 36
 Even were we to recognize such a presumption, the evidence here fully supported a jury finding that deSavary was the beneficial owner of IRC's stock.
 
 
 37
 First, as already discussed, deSavary's testimony on the subject was properly before the jury, Willco's objection having come too late. Once properly before the jury, that evidence was entitled to whatever weight the jury determined. Passaic Daily News v. NLRB, 736 F.2d 1543, 1554 n. 15 (D.C.Cir.1984); E. Cleary, McCormick on Evidence Sec. 54 (1984).
 
 
 38
 Second, there was other evidence from which to infer ownership. There was evidence that deSavary had deposited $5.3 million of his personal monies with IRC's French bank as security for IRC's indebtedness. From the risking of his personal monies on behalf of IRC the jury could have inferred that deSavary was the actual owner of IRC. In addition to this, Willco introduced into evidence the notification form required by the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. Sec. 18A (1982); 16 C.F.R. Secs. 801-03 (1987). This form has to be filed with the Federal Trade Commission before an acquisition or merger is consummated, and deSavary did so here. The exhibit stated that "PENINSULAR PETROLEUM CORPORATION is a wholly-owned subsidiary of PENINSULAR PETROLEUM B.V., A Netherlands Corporation, one hundred percent of whose voting securities are directly owned by Peter deSavary."
 
 
 39
 It is relevant, too, that Willco's witness, Mr. Elbaz, testified at trial that it was his understanding that deSavary owned 100 percent of IRC's stock and that he never learned anything different. None of Willco's witnesses testified that they at any time had understood that deSavary was not the owner of IRC. Lack of ownership was never raised by Willco during the negotiations with deSavary, nor was it included as one of the reasons for Willco's deciding not to go forward with the contract. Indeed, in the letter sent by Willco to deSavary on May 19, 1982, officially requesting from the latter the return of the $10 million invested by Willco in IRC, Willco stated,
 
 
 40
 It appears clear from the records of IRC that prior to May 29th 1981, you commenced negotiations with IRC and/or its stockholders or directors with a view toward acquiring control of IRC, and that at the time when you were elected Chairman of its Board of Directors on May 29, 1981, you in fact acquired full control of IRC and continue to control it as of this date.
 
 
 41
 (Emphasis added.)
 
 
 42
 No evidence was introduced that deSavary was unable to transfer to Willco the amount of IRC's stock called for under the contract.
 
 
 43
 On this record, we think the jury could reasonably conclude that deSavary was the actual owner of IRC's stock.
 
 B. Irrelevant Evidence
 
 44
 Willco claims error in respect to the district court's exclusion, on grounds of irrelevancy, of certain evidence it tried to introduce. Specifically, the court excluded evidence of 1) the price paid by deSavary for the stock of IRC; 2) deSavary's alleged self-dealing and conflicts of interest; and 3) deSavary's use of the $10 million paid by Willco to deSavary under the contract.
 
 
 45
 In reviewing the lower court's exclusionary rulings, we recognize that the district court "retains considerable latitude even with admittedly relevant evidence in rejecting that which is cumulative, and in requiring that which is to be brought to the jury's attention to be done so in a manner least likely to confuse that body." Hamling v. United States, 418 U.S. 87, 127, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590 (1974). This court has frequently observed that the district court has broad discretion in determining the admissibility of evidence based on relevance and materiality, and that such rulings must be reviewed only for abuse of discretion. United States v. Drougas, 748 F.2d 8, 24 (1st Cir.1984); United States v. Sorrentino, 726 F.2d 876, 886 (1st Cir.1984); United States v. Gonsalves, 668 F.2d 73, 75 (1st Cir.), cert. denied, 456 U.S. 909, 102 S.Ct. 1759, 72 L.Ed.2d 168 (1982). We see no abuse of discretion here.
 
 
 46
 Willco asserts that the excluded evidence was critical to show 1) deSavary's knowledge of IRC's poor financial condition, and 2) deSavary's fraudulent intent. With regard to the former, there is no controversy. DeSavary admitted at trial that IRC was in poor financial condition and that he knew this. The real issues were the extent to which Willco knew or should have known of IRC's financial plight and the extent to which deSavary mislead it. Evidence of the price deSavary paid for IRC, of deSavary's alleged self-dealings and conflicts of interest, and of deSavary's use of the money paid by Willco was of secondary relevance at best.
 
 
 47
 Willco argues that the price deSavary paid for the IRC stock was strong circumstantial evidence of deSavary's fraudulent intent. However, Willco executed the July 19, 1981, contract expressly knowing that deSavary would not disclose to it the price he paid for IRC. Mr. Elbaz testified that he had requested from deSavary in June 1981, before entering into the "handshake" agreement, the details concerning deSavary's acquisition of IRC, and that deSavary adamantly refused to disclose the price he paid or to show the documents of the transaction. Willco voluntarily decided to proceed with the transaction even after deSavary had refused to furnish the information requested. Given these facts, there can be no claim of misrepresentation or material omission relative to the price information. We think the evidence was of minor relevance.[5]
 
 
 48
 Willco alleges that evidence of deSavary's alleged self-dealing was relevant to prove that while negotiating with Willco, deSavary was acting suspiciously. Specifically, Willco sought to introduce evidence that deSavary sold IRC's non-refinery assets to other corporations owned by deSavary. Not all evidence of this type was in fact excluded, however. Evidence went in that IRC was desperate for cash and was selling some of its non-refinery assets. Some of the evidence that was excluded related to transactions entered into after the contract was executed. As for the rest, the court found that deSavary was not shown to have been acting suspiciously or improperly. Willco admitted at trial that it had no evidence that deSavary was seeking to acquire personally or to sell IRC's assets for less than fair market value, or that he was embezzling IRC's funds. We think the court was within its discretion in refusing to open up this area of inquiry.
 
 
 49
 Finally, Willco claims that evidence that deSavary put the $10 million paid by Willco pursuant to the contract into his own pocket is circumstantial evidence of deSavary's fraudulent intent. Willco suggests this money should have gone to IRC. We do not see the pertinence of such evidence. The contract provided for payment of the money to deSavary, not to IRC. Willco presented no evidence showing that deSavary had a duty to remit the funds to IRC's treasury.
 
 
 50
 We conclude that the district court acted within its discretion in refusing the above evidence. United States v. Sorrentino, 726 F.2d at 886.
 
 C. Hearsay
 
 51
 Samir Seraphim was engaged by Willco to conduct an investigation of IRC's financial status. It is Willco's contention that Dr. Seraphim did not conduct a thorough investigation and that he did not have access to IRC's current financial information. Seraphim did not testify. Willco sought unsuccessfully to introduce a telex from Seraphim to Elbaz which disclosed that Seraphim did not see current IRC financial information while he was investigating IRC. The telex was dated more than three months after Seraphim's report was delivered.[6]
 
 
 52
 Willco argues that the district court should have admitted the telex under one of the following theories: 1) deSavary waived his objection to the telex; 2) it was an admissible business record under Fed.R.Evid. 803(6); 3) the telex was admissible under the residual hearsay exception of Fed.R.Evid. 803(24); and 4) it was pertinent for the limited purpose of showing Willco's state of mind. The district court did not err in excluding the telex.
 
 
 53
 Willco alleges that deSavary waived any objection to the telex because during his testimony deSavary made reference to Seraphim's investigation. The argument is without merit. That deSavary referred to Seraphim's investigation did not waive the hearsay character of the telex. The telex, moreover, was offered before deSavary's testimony; Willco never offered it later as in some way responsive to deSavary's testimony. The district court had good reason not to regard the telex as a business record. For a document to be admissible under Fed.R.Evid. 803(6) it has to be made "at or near the time" of the events recorded. Petrocelli v. Gallison, 679 F.2d 286, 289 (1st Cir.1982); J. Weinstein & M. Berger, Weinstein's Evidence p 803(6)[.05] (1987). This telex, sent on October 23, 1981, made reference to Seraphim's investigation and report which occurred more than three months before.
 
 
 54
 In addition to contemporaneity, Rule 803(6) requires that the document be made in the course of a regularly conducted activity of the business. A non-routine record if "made in the course of a regularly conducted 'business' should be admissible if [it] meet[s] the other requirements of Rule (6) unless 'the source of the information or other circumstances indicate lack of trustworthiness.' " J. Weinstein & M. Berger, Weinstein's Evidence, p 803(6), at 803-182 (1987). See Petrocelli v. Gallison, 679 F.2d at 291 n. 3. Here the district court was justified in doubting the trustworthiness of the telex. It was sent October 23, 1981, two days before Willco sent deSavary the letter stating that deSavary had misrepresented to Willco the financial condition of IRC. The telex was in clear support of that position. Seraphim was not an employee of Willco, and Willco never offered Seraphim's report in evidence. Seraphim did not testify at trial and apparently was never deposed or subpoenaed. Given all these factors, the district court was entitled to conclude, in its discretion, that the telex did not meet the requirements of Rule 803(6). Cf. Palmer v. Hoffman, 318 U.S. 109, 114, 63 S.Ct. 477, 481, 87 L.Ed. 645 (1943) (accident report prepared by a railroad company employee not admissible because the Court concluded that it was prepared basically for use in the litigation).
 
 
 55
 The lower court also properly declined to admit the telex under Fed.R.Evid. 803(24), the residual hearsay exception. Not only was it of questionable trustworthiness, but Willco failed to provide deSavary with advance notice either of its intention to offer the telex under Rule 803(24) or of the address of the declarant, as required by the rule.
 
 
 56
 Finally, since Willco never expressly offered the telex for the purpose of showing Willco's state of mind, the district court did not err in not considering that basis for admission.
 
 
 57
 Willco also complains that it was not allowed by the district court to read before the jury an affidavit of its chairman, Omar Alyagout, after his videotaped deposition had been played for the jury. In the deposition Alyagout stated that he did not believe in "any project offering by [deSavary]." The affidavit sought to alter Alyagout's videotaped testimony in order to state that he did not believe "only" in the IRC project. The district court's ruling was proper. The purported change was considerably more than a mere explanation or correction of the videotaped deposition. A critical component of Willco's case was its alleged trust in and reliance upon deSavary. The jury viewed the videotaped testimony and determined for themselves the clarity and credibility of Mr. Alyagout's testimony. Willco could have put Alyagout on the witness stand where he would have been subject to cross-examination. The affidavit would have deprived deSavary of an opportunity to cross-examine. Cf. Rogers v. Roth, 477 F.2d 1154 (10th Cir.1973) (permitting written changes in a witness's deposition because the witness gave another deposition after the changes were made, and he was examined at length as to the reasons for the changes ). The court acted properly.
 
 III.
 
 58
 Willco contends the district court committed reversible error in its instruction to the jury with regard to reliance, materiality, missing witness and missing evidence. We have considered these arguments carefully and find them without merit. Certain of the instructions given were clearly correct. Others were at least sufficiently correct to fall within the lower court's considerable discretion in respect to the giving of instructions and their wording and emphasis.
 
 IV.
 
 59
 We now turn to Willco's appeal from the judgment for deSavary in his counterclaim for breach of contract against Willco.
 
 
 60
 The district court granted Willco's motion for a directed verdict with respect to deSavary's fraud counterclaim, but denied the motion with respect to the breach of contract counterclaim. The court later also denied Willco's motion for judgment n.o.v. and for a new trial in respect to the contract counterclaim.
 
 
 61
 Willco argues that deSavary's breach of contract counterclaim should have been dismissed because there was a failure of consideration. This defense rests upon two grounds: 1) the virtual worthlessness of IRC, and 2) deSavary's breach of his warranty of title to the IRC stock.
 
 
 62
 We find no merit to this contention. The jury was entitled to determine that IRC was not worthless and (for reasons already considered) that deSavary was the owner of IRC's stock. There was a genuine factual controversy as to each. The fact that IRC was having financial problems at the moment the contract was executed did not mean that the refinery was worthless. Some evidence tended to show that the refinery asserts had value in excess of $100 million. The district court did not err in denying Willco's motions for judgment n.o.v. and for a new trial. Coffran v. Hitchcock Clinic, Inc., 683 F.2d 5, 6 (1st Cir.1982); Hubbard v. Faros Fisheries, Inc., 626 F.2d 196, 199-200 (1st Cir.1980).
 
 
 63
 Willco's more serious contention is that there was insufficient evidence to support the award of $5.3 million in consequential damages on deSavary's contract counterclaim. The $5.3 million figure arose from deSavary's assertion that he had deposited that sum with a bank to secure a $50 million letter of credit for IRC, relying on Willco's pledge in the contract that it was going to secure another $50 million letter of credit for IRC. DeSavary alleges that he ultimately lost the $5.3 million as a consequence of Willco's default on the contract. Viewing the evidence in the light most favorable to the prevailing party, without weighing the credibility of the witnesses, we conclude that the evidence is insufficient to support the consequential damages award.
 
 
 64
 When a contract has been broken, the other party is entitled to receive those damages "arising according to the usual course of things, ... or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract...." George v. George F. Berkander, Inc., 92 R.I. 426, 169 A.2d 370, 372 (1961). In the present case, the $5.3 million is neither a component of the purchase price, nor is it otherwise mentioned in the agreement. To recover, deSavary had to prove that, relying on Willco's promise contained in the contract to secure an additional $50 million letter of credit for IRC, deSavary could be expected to deposit such a sum as the $5.3 million with a bank to secure a different $50 million letter of credit for IRC. "If these special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract." Id. 169 A.2d at 373. After examining the record we conclude that there is insufficient evidence that Willco had reason to anticipate the $5.3 million deposit when it entered into the July 19, 1981, agreement.
 
 
 65
 DeSavary testified to the effect that he had told Willco's officers during June 1981 that he had obtained a $50 million letter of credit for IRC, that he was negotiating another letter of credit for $25 million, and that an additional letter of $50 million was needed as working capital. Under the July 19, 1981, contract Willco was obliged to obtain the additional $50 million letter of credit. From that testimony, a weak inference can arguably be made that Willco had knowledge that if it did not get the additional line of credit as required by the contract, IRC would be liable for other prior loans. However, deSavary did not testify that he told Willco's officers that the $50 million letter of credit he had secured for IRC prior to the execution of the contract had been secured with $5.3 million of his personal funds. There is no proof that deSavary, or anybody, told Willco's officers the collateral, if any, that IRC had given for the letter of credit. There is no evidence to sustain a finding that Willco had knowledge that deSavary had deposited $5.3 million as collateral for IRC's letter of credit. We conclude that there is insufficient basis in the record to allow for this item.
 
 V.
 
 66
 We now address the issues raised by deSavary on his cross appeal.
 
 
 67
 DeSavary claims that the district court erred in directing a verdict for Willco on deSavary's fraud counterclaims. DeSavary claimed in his counterclaim that Willco executed the July 19, 1981, agreement and later broke that contract as part of a fraudulent scheme to acquire control of IRC. DeSavary makes on appeal a general assertion that the evidence presented was sufficient for a jury to find in his favor on his fraud claim against Willco. However, he fails to point to any specific evidence of Willco's fraudulent activities. After carefully studying the complete record, and viewing the evidence in the light most favorable to deSavary, we do not find material evidence sufficient to create a jury issue on deSavary's fraud claim. The court did not err in directing a verdict on that claim.
 
 
 68
 DeSavary also contends that the court erred in denying his motion for an award of attorneys' fees pursuant to section 11(e) of the Securities Act of 1933, 15 U.S.C. Sec. 77k(e) (1982). Under this section, attorneys' fees could be awarded to the prevailing party, "if the court believes the suit or defense to have been without merit." This was a complex case with considerable controversy over the facts. Assessment of the relative merits of Willco's claims and defenses was primarily for the district court, which was in the best position to judge. That Willco did not prevail does not by itself establish that its case was devoid of all merit. See Aid Auto Stores, Inc. v. Cannon, 525 F.2d 468, 471 (2d Cir.1975). The court's determination here was within the range of reason. We find no abuse of discretion in the denial of attorneys' fees.
 
 
 69
 The case is remanded for a reduction in damages, and affirmed in all other respects.
 
 
 
 *
 Of the Third Circuit, sitting by designation
 
 
 [1]
 One of the disputed issues was the scope of Seraphim's investigation and whether he had been instructed to delve deeply into IRC's situation
 
 
 [2]
 We note that even before the adoption of Rule 704 there was strong opposition among scholars to the rule excluding testimony with regard to possession, ownership, necessity, authority, etc. As stated by Wigmore,
 if a witness, in the course of his testimony, comes to mention that A "possessed" or B "owned" or C was "agent," let him not be made dumb under the law, and be compelled by evasions and circumlocutions to attain the simple object of expressing his natural thought. If there is a real dispute as to the net effect of the facts, these may be brought out in detail on cross examination."
 
 
 [7]
 J. Wigmore, Evidence Sec. 1960 at 128
 
 
 [3]
 This was not the only occasion during Willco's cross-examination of deSavary that Willco brought out the issue of ownership:
 Q. .... On July 19, 1981, were you personally the owner of Independent Refinery Corporation?
 A. By way of contract of purchase, I was.
 Q. Was the contract in your name?
 A. No, it was through a company of which I was the sole beneficiary.
 Q. And what was the name of the company?
 A. Penninsula [sic] Petroleum.
 
 
 [4]
 Rule 103(a)(1) states as follows:
 (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
 (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context.
 
 
 [5]
 Weitzman v. Stein, 436 F.Supp. 895 (S.D.N.Y.1977), on which Willco relies, is clearly distinguishable. There, the plaintiff brought a fraud claim alleging that the defendants had induced him to purchase stock while concealing that they had a secret option to purchase the same stock at less than half the market price paid by plaintiff. The plaintiff in Weitzman had no idea that the defendants owned an option to purchase stock at a lower price. Here, Willco knew that deSavary had acquired IRC recently and that deSavary had refused to disclose the information expressly requested
 
 
 [6]
 The report was never offered as evidence at trial